UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ALBERT THOMAS, | ) | |
| | ) | Case No. 1:21-cv-1844 |
| PLAINTIFF, | ) | |
| | ) | Hon. Sharon Johnson Coleman |
| vs. | ) | Magistrate Judge Heather K. McShain |
| | ) | |
| | ) | |
| CHICAGO TEACHERS' | ) | |
| PENSION FUND, | ) | |
| | ) | |
| DEFENDANT, | ) | |

## THIRD AMENDED COMPLAINT

NOW COMES, Plaintiff, ALBERT THOMAS, by and through his attorneys, CARLA D. AIKENS, P.L.C., to submit the following First Amended Complaint against Defendant, CHICAGO TEACHERS' PENSION FUND.

## JURY DEMAND

COMES NOW Plaintiff, ALBERT THOMAS, and hereby makes his demand for trial by jury.

## JURISDICTION

1. At all relevant times, Plaintiff, ALBERT THOMAS was a resident of Cook County in the State of Illinois.

2. Defendant Chicago Teachers' Pension Fund is, upon information and belief, an Illinois entity whose principal offices are in Chicago, Illinois.

3. Defendant maintained a systematic place of business in Cook County in Chicago, Illinois.

4. The relevant actions giving rise to this complaint took place in Cook County in the State of Illinois.

1

5. This action is brought in this Court on the basis of federal question jurisdiction, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C 2000e et seq.

6. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's state law claims.

## VENUE

7. Venue is proper in the Northern District of Illinois pursuant to Section 706(f)(3) of Title VII, 42 USC § 2000e-5(f)(3), because the unlawful employment discrimination giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

8. Defendant Chicago Teacher's Pension Fund is an Illinois public employee pension fund within the Illinois Pension Code that is established to pay pensions to eligible employees of Chicago Public Schools and Chicago charter schools.

9. Plaintiff is 64 years old and is an African American male who is currently a longtime employee of Defendant, employed as a Senior Accountant.

10. In his role with Defendant he has been responsible for oversight of the pension funds.

11. Upon information and belief, as far back as 2012, overpayments and accounting summary errors were being made, devoid of any notifications by Defendant to the accountholders or their representatives.

12. After 2012, Plaintiff began to suspect accounting errors on the part of Defendant.

13. At his urging and after reporting to his boss, an accounting was performed.

14. Said accounting revealed that payments were made incorrectly and that there were accounting errors.

15. Plaintiff reported these errors to his boss, the CFO of Defendant. The CFO admonished Plaintiff not to do anything or report anything to anyone. The CFO was later terminated and replaced by a different person.

16. Plaintiff thereupon reported the auditor's findings of the auditor to the new CFO, who as well admonished him not to report or do anything.

17. Notwithstanding, Plaintiff told three other persons in hopes that something official would be done.

18. Plaintiff waited and realized that no errors were going to be corrected and/or reported to the affected accountholders and/or their representatives.

19. That recently, it was decided by Defendant to arbitrarily come up with an amount vastly different from the true errors, an amount which had been calculated by an independent contractor.

20. That in 2019, Plaintiff eventually pursued legal action against Defendant related to the above conduct by Defendant.

21. That Plaintiff has suffered retaliation for reporting the above, as indicated herein.

22. In this time, Plaintiff has applied for numerous promotions with Defendant, including in 2019 for a position as Operation Manager of Accounting for Defendant.

23. Plaintiff was informed that the interview would require a written skills test. He was provided no further information or instruction from Defendant.

24. It was later revealed that the other candidates for the position were provided the topics for the written test well in advance of the final interview.

25. Defendant intentionally withheld material information from Plaintiff, which caused him to be disadvantaged and ultimately denied the position.

26. In February 2020, Plaintiff again applied for a position as Accounting Manager with Defendant.

27. Despite having the experience and qualifications for this position, Plaintiff was not selected for an interview.

28. Instead, Defendant filled the position of Accounting Manager with a temporary employee, Daniel Trevino, who lacked the necessary accounting experience and had no familiarity or history with Defendant.

29. Plaintiff was left with the task of "training" the new Account Manager about the historical processes and accounting procedures.

30. Shortly after Plaintiff requested additional approval to write off about $8 million, Defendant began to isolate, bully, and harass Plaintiff.

31. Defendant accused Plaintiff of insubordination for requesting a higher approval to write off the $8 million.

32. Plaintiff reasonably believed writing off the $8 million without board approval was improper.

33. There were a litany of overpayments and Plaintiff was unsure of which specific individual was responsible.

34. Generally, the overpayments and underpayments came from the health insurance team.

35. Over the last year, Plaintiff' job duties have continued to increase. He is required to perform tasks of the higher level positions of Accounting Manager and Operations Manager, but has been denied the salaries that correspond to those positions.

36. Defendant is intentionally denying Plaintiff an opportunity to be promoted.

37. Further, Plaintiff was treated differently from other non-African American employees, including being denied promotions and being paid less than other employees.

38. Plaintiff was also treated differently on account of his age, and is being paid less and denied promotions on the basis of his age.

39. While employed Plaintiff noticed that several younger, less-qualified female non-African American employees had been promoted over him, even though they had not been employed with Defendant for as long. These individuals include, but are not limited to: Evelyn Abrego, Amy Motyka, Brenda Jimenez, Greta Perez, Lorena Aviles, and Janet Camacho.

40. Specifically, Plaintiff was treated differently from other younger, female co-workers by Defendant's agent, Michael Aguilar, among others.

41. For example, Aguilar denied Plaintiff an opportunity to learn and develop different software systems. Aguilar denied Plaintiff tasks requiring computer skills. Instead, Aguilar forced Plaintiff to do work outside the scope of his job description.

42. When the team would discuss issues with computers, Aguilar excluded Plaintiff because he believed Plaintiff would not grasp the concepts due to Plaintiff's age.

43. Plaintiff complained about this mistreatment and suffered damages for speaking up in the way of lack of promotion and lesser pay. As a result, Aguilar began micro-managing and harassing Plaintiff.

44. For example, Plaintiff would use the restroom, and when he returned to his work area, Aguilar would interrogate and accuse him of skipping out on work. This micro-managing did not happen until after Plaintiff complained.

45. In another incident, approximately a week before the meeting regarding non-disclosure agreements mentioned below, Plaintiff had a meeting with Aguilar for a pre-set time.

46. Just prior to the start of said meeting, the internal auditor was reporting Plaintiff's complaints to a board member regarding an improper financial transaction.

47. The internal auditor asked Plaintiff to come to her meeting and answer the board member's questions, stating that it would only take five minutes.

48. However, the conversation with the Board member went past the time, causing him to be late for his meeting with Aguilar.

49. Aguilar became very upset, stating that Plaintiff should not have left him waiting. Plaintiff told him that he had a meeting with a Board member, to which Aguilar stated he did not care if he was in a meeting with God, he needed to be on time.

50. Defendant launched a campaign against Plaintiff in an effort to fire him.

51. Plaintiff overheard a conference call phone conversation with Antonio Holmes, Daniel Trevino, and CFO Alise White. Holmes told Trevino, "the only way we get rid of [Plaintiff], is to document everything you give him."

52. CFO White agreed and added, "Yes. You need to be very careful with him. If he sees something wrong or suspects something wrong, he [Plaintiff] is going to report it."

53. On another occasion, the Finance team met about non-disclosure agreements. Plaintiff questioned the need of the document. Aguilar stood up in front of the team and began to yell and scream at Plaintiff.

54. Following this meeting, Plaintiff and Aguilar were in the restroom when Aguilar asked Plaintiff a question about an incident that occurred during the meeting, to which Plaintiff replied that he did not recall the incident.

55. In response, Aguilar said to Plaintiff, "that's easy for you to say, n*****." In response, Plaintiff left the restroom and said nothing to Aguilar.

56. Plaintiff reported the incident to an agent of Defendant, stating that Aguilar had spoken to him in a derogatory manner.

57. Upon information and belief, the matter was presented to the Board of Defendant, but nothing was done nor was there any discipline for Aguilar's comments.

58. After this conversation, Plaintiff and several employees were out of work due to a severe snow storm. These employees could not access Defendant's computer system. Plaintiff called Defendant's IT department, but IT could not get Plaintiff in the system.

59. Holmes and Aguilar gave Plaintiff a hard time for missing work due to bad weather.

60. Then, White and Aguilar wrote a two page memo warning him about trivial issues and/or mistakes. They made Plaintiff sign a written policy regarding leave.

61. Plaintiff complained to board of directors and Defendant's hotline about this retaliation, harassment, and discrimination. Defendant never responded. Plaintiff was never interviewed. Plaintiff believes Defendant never investigated the retaliation from Holmes, Aguilar, and White.

62. At meetings with Aguilar and other staff several times per month, Aguilar regularly told Plaintiff to take notes – a comment he never made to anyone else.

63. Plaintiff complained about how Aguilar talked to him, and how Aguilar gave preferential treatment to female employees over Plaintiff.

64. This preferential treatment including with respect to days off, absences, tardies, and working-from-home.

65. Defendant had a policy that there were "blackout" days for days off.

66. Plaintiff, the only male in his department besides Aguilar, was not permitted to take off on a "blackout" day.

67. In one incident, Aguilar gave a female employee a day off during a "blackout" day.

7

68. When Plaintiff questioned Aguilar about it, Aguilar told him not to question him because he was undermining his authority.

69. Plaintiff reported this conduct to the internal auditor, who stated that she passed his comments along to the Board, but nothing was done by Defendant.

70. As a result of Defendant's actions as described herein, and consequent harm, Plaintiff has suffered such damages in an amount to be proven at trial.

71. Plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") on the basis of age, race and retaliation, and received his Notice of Right to Sue from the EEOC on January 12, 2021.

72. During the pendency of Plaintiff's claim, Defendant suspended him for alleged accounting errors, and attempted to confiscate his laptop, which was not consistent with Defendant's policy.

73. After an alleged investigation, Plaintiff was terminated on August 5, 2022, by the same person he accused of discrimination and that was promoted over him.

74. Plaintiff filed an amended charge with the EEOC and received a notice of his right to sue letter on April 6, 2023.

75. This lawsuit seeking redress for Defendant's actions followed.

## COUNT I

**DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF TITLE VII**

76. Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint, as if fully set forth herein.

77. At all material times, Defendant was an employer covered by, and within the meaning of Title VII.

78. At all material times, Plaintiff was an employee covered by, and within the meaning of Title VII.

79. Defendant's conduct, as alleged herein, violated Title VII which makes it unlawful to discriminate against an employee on the basis of race.

80. A respondeat superior relationship existed because Defendant's agents, including the managers and supervisors mentioned herein, had the ability to undertake or recommend tangible decisions affecting Plaintiff, and the authority to direct Plaintiff's daily work activity.

81. Plaintiff's race is African American, and as such, he is a member of a protected class.

82. Plaintiff was discriminated against on the basis of his membership in this protected class, including but not limited to not being promoted, being underpaid, and giving him different, less preferential terms and conditions of employment, as compared to other employees outside of his protected class, and eventually suspending and terminating him.

83. The Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

84. As a proximate result of the Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, position, humiliation, mental anguish, and emotional distress, including termination.

85. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

86. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT II

## DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF THE ILLINOIS HUMAN RIGHTS ACTS ("IHRA")

87. Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint, as if fully set forth herein.

88. At all material times, Plaintiff was an employee, and Defendant was an employer covered by, and within the meaning of the Illinois Human Rights Act, 775 ILCS 5 et seq.

89. Defendant's conduct, as alleged herein, violated the Illinois Human Rights Act, 775 ILCS 5 et seq, which makes it unlawful to discriminate against an employee because of their race.

90. A respondeat superior relationship existed because Defendant's managers and supervisors had the ability to undertake or recommend tangible decisions affecting Plaintiff, and the authority to direct Plaintiff's daily work activity.

91. Plaintiff's race is African American, and as such is a member of a protected class.

92. Plaintiff was subjected to discrimination on the basis of his membership in this protected class, including but not limited to not being promoted, being underpaid, and giving him different, less preferential terms and conditions of employment, as compared to other employees outside of his protected class, and eventually suspending and terminating him.

93. The discrimination was intended to or in fact did substantially interfere with the Plaintiff's employment, as alleged in the statement of facts.

94. As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of professional reputation.

95. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT III

### DISCRIMINATION ON THE BASIS OF AGE IN VIOLATION THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 ("ADEA")

96. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

97. At all material times, Plaintiff was an employee, and Defendant his employer covered by, and within the meaning of the ADEA.

98. A respondeat superior relationship existed because Plaintiff's supervisors had the ability to undertake or recommend tangible decisions affecting Plaintiff and the authority to direct his daily work activities, as alleged in the statement of facts.

99. Defendant's conduct, as alleged herein, violated the ADEA, which makes it unlawful to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."

100. Plaintiff was born on June 24, 1956 and is sixty-four years old, and as a result, is a member of a protected class for the purposes of the ADEA.

101. Plaintiff was being systematically targeted, given different work conditions, paid less and not promoted, while younger, less experienced employees were promoted, paid more, and given greater leeway in the terms and conditions of their work.

102. As a result, younger employees were being promoted at a faster rate than Plaintiff.

103. As a direct and proximate result of the Defendant's wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of professional reputation.

104. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

105. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT IV

### DISCRIMINATION ON THE BASIS OF AGE IN VIOLATION OF IHRA

106. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

107. At all material times, Plaintiff was an employee, and Defendant was an employer covered by, and within the meaning of, the IHRA.

108. A respondeat superior relationship existed because Plaintiff's supervisors undertake or recommend tangible decisions affecting Plaintiff and the authority to direct all of Plaintiff's daily work activity, as alleged in the statement of facts.

109. Defendant's conduct, as alleged herein, violated the IHRA which makes it unlawful to discriminate against an employee on the basis of their age.

110. The IHRA makes it so Plaintiff, being over 40 years of age, is a member of a protected class for the purpose of his age.

111. Plaintiffs, like the other older employees, was mistreated, paid less and not promoted, unlike less experienced, younger employees who were being treated better, paid more and received promotions.

112. As a direct and proximate result of the Defendant's wrongful acts and omissions, Plaintiff has sustained losses of earnings, earning capacity, and fringe benefits and has suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of professional reputation.

113. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

114. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT V

## RETALIATION IN VIOLATION OF TITLE VII

115. Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint, as if fully set forth herein.

116. At all material times, Plaintiff was an employee and Defendant was an employer covered by, and within the meaning of Title VII.

117. Defendant's conduct, as alleged herein, violated Title VII, which makes it unlawful to retaliate against an employee for engaging in protected activity.

118. A respondeat superior relationship existed because Defendant's managers and supervisors had the ability to undertake or recommend tangible decisions affecting Plaintiff or the authority to direct Plaintiff's daily work activity as alleged in the statement of facts.

119. Plaintiff engaged in protected activity when he took the following actions, including but not limited to, reporting discrimination to Defendant's agents, including managers and supervisors, and/or believing that Plaintiff reported the same to other persons.

120. After Plaintiff engaged in protected activity, Defendant's agents thereafter took several adverse employment actions against Plaintiff because of that activity, as alleged in the statement of facts and herein, subjecting Plaintiff to retaliation for voicing his opinion regarding discrimination, including but not limited to:

a. manipulating Plaintiff's work;

b. refusing to promote Plaintiff;

c. criticizing Plaintiff's work performance;

d. giving Plaintiff "poor" performance reviews;

e. paying Plaintiff less than other employees; and

f. suspending and terminating Plaintiff.

121. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

122. As a proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, position, earning capacity, humiliation, mental anguish, and emotional distress.

123. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

124. Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT VI

### RETALIATION IN VIOLATION OF IHRA

125. Plaintiff hereby incorporates by reference the preceding paragraphs of this Complaint, as if fully set forth herein.

126. At all material times, Plaintiff was an employee, and Defendant was an employer covered by, and within the meaning of the Illinois Human Rights Act, 775 ILCS 5 et seq.

127. Defendant's conduct, as alleged herein, violated the Illinois Human Rights Act, 775 ILCS 5 et seq, which makes it unlawful to retaliate against an employee because he engaged in protected activity.

128. Plaintiff engaged in protected activity when he took the following actions, including but not limited to, reporting discrimination, including being undermined, mistreated, passed over for a promotion and underpaid, and/or believing that Plaintiff reported the same to other persons.

129. After Plaintiff engaged in protected activity, Defendant's agents thereafter took several adverse employment actions against Plaintiff because of that activity, as alleged in the statement of facts and herein, subjecting Plaintiff to retaliation for voicing his opinion regarding his lack of accommodations, including but not limited to:

    a. manipulating Plaintiff's work;

    b. refusing to promote Plaintiff;

    c. criticizing Plaintiff's work performance;

    d. giving Plaintiff "poor" performance reviews;

    e. paying Plaintiff less than other employees; and

    f. suspending and terminating Plaintiff.

130. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

131. As a proximate result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, position, earning capacity, humiliation, mental anguish, and emotional distress.

132. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proven at trial.

133. Plaintiff requests the relief as described in the Prayer of Relief below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff ALBERT THOMAS, respectfully requests that this Honorable Court enter judgment against Defendant as follows:

    1. Compensatory damages in whatever amount to which Plaintiff is entitled;

    2. Exemplary damages in whatever amount which Plaintiff is entitled;

3. An award of lost wages and the value of fringe benefits, past and future;

4. An award of interest, costs, and reasonable attorney fees; and,

5. An order awarding whatever other equitable relief appears appropriate at the time of final judgment.

Respectfully Submitted,

<u>/s/ Carla D. Aikens</u>

Carla D. Aikens (6296269)

Attorneys for Plaintiff

Dated: September 25, 2023